# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KEISHA L. CURL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 05 C 87 |
| vs. | ) | |
| | ) | Magistrate Judge Morton Denlow |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Keisha L. Curl ("Plaintiff" or "Claimant") challenges the decision of Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that the denial of Plaintiff's request for Supplemental Security Income benefits ("SSI") and Disability Insurance benefits ("DIB") should be reversed or remanded because the Administrative Law Judge ("ALJ"): (1) erred in failing to include all of Plaintiff's limitations identified by the reviewing physician and in failing to use all of those limitations in the hypothetical question to the Vocational Expert ("VE"); (2) failed to consider the extent to which mental health professionals—particularly Plaintiff's most recent treating psychiatrist—considered Plaintiff limited by her alleged disability; (3) improperly rejected the credibility of Plaintiff's testimony regarding her alleged disability; and (4) failed to adequately articulate the grounds for his decision.

This case comes before this Court on Plaintiff's motion for summary judgment and

Defendant's cross-motion for summary judgment. For the reasons stated below, this Court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment, and remands the case to the Commissioner for a further hearing.

## I. BACKGROUND FACTS

**A.     PROCEDURAL HISTORY.**

Plaintiff filed applications for DIB and SSI payments effective September 6, 2002, alleging that she became disabled on September 17, 2002, as a result of bipolar disorder. R. 256-59, 279. The Social Security Administration ("SSA") denied the claim initially and on reconsideration, and Plaintiff filed a timely request for a hearing. R. 233-37. ALJ Michael J. Bernstein held a hearing on November 18, 2003. R. 23-68. The ALJ issued a decision denying Plaintiff's claims on May 25, 2004. R. 11-21. The Appeals Council denied Plaintiff's request for review on November 5, 2004. R. 7-9.

Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The parties have consented to this Court's jurisdiction to decide the case pursuant to 28 U.S.C. § 636(c)(1). The Court conducted an oral argument on February 14, 2006 on the parties' cross-motions for summary judgment.

**B.     HEARING TESTIMONY - NOVEMBER 18, 2003.**

**1. Plaintiff's Testimony**

On November 18, 2003, Plaintiff appeared with her attorney, Robert Kielian, and testified before ALJ Bernstein. R. 26-56. Plaintiff was 22 years old at the time of the

hearing. R. 26. Plaintiff is single and has two children – ages six and two. R. 27. She lives with her mother, father and three siblings. *Id.* Plaintiff's oldest daughter lives with the child's father, and her youngest daughter lives with the child's grandmother. *Id.*

Plaintiff has a tenth grade education. *Id.* She was enrolled in special education programs while in elementary school and high school. R. 52. Plaintiff can read and write, but her reading skills are limited. R. 28. She was enrolled in a General Equivalency Diploma course from January 2003 to March 2003, but did not complete the course due to the effects of her alleged disability. R. 53.

Plaintiff alleges a disability onset date of September 17, 2002, which is the approximate date of her last employment. R. 28. At that time, she was providing childcare in a friend's home six days a week, but quit work because she "started to have panic attacks" and her "nerves [got] really bad." *Id.*

At the time of the hearing, Plaintiff was taking medication prescribed by her treating psychiatrist, Dr. Guschwein, including Lorazepem for her panic disorders and anxiety attacks; Remeron to "calm [her] down"; Sulfameth-trimethoprim for unknown reasons; and Zoloft for depression. R. 29-30. Plaintiff explained that the medications helped her condition, though she continued to have panic attacks twice a day even when taking the medication. R. 31-33. These attacks lasted approximately five minutes and incapacitated Plaintiff to the point where she was "basically doing nothing" during their duration. R. 33.

The attacks could occur when she was out of the house. R. 35. For example, as often

as three out of every four times Plaintiff attempted to go to the grocery store, the anxiety forced her to return home before reaching the store. *Id.* The attacks also prohibited her from doing outside activities such as yard work. R. 36. During a typical day, Plaintiff would wake up, bathe herself, prepare breakfast, and attempt to visit her children. R. 37. Her attacks were made worse by contact with her children, who she attempted to visit four days a week. R. 37-38.

Prior to her alleged disability onset in September of 2002, she worked as a cashier at Burger King for three weeks. R. 44. She left the job because of stress and the fact that she was "always forgetting stuff." *Id.* Previously, she worked at the College of St. Francis for six to eight months as a cafeteria "line server." *Id.* Plaintiff left that position because she "could not deal with the people" and because her panic attacks made her forgetful and scared. R. 45.

Plaintiff also worked as a cashier at McDonald's in 1999. R. 46. At McDonald's she worked 40 hours per week for almost a year and she did not experience panic attacks. R. 46-47. Her panic attacks began while she was in jail in 2001. R. 47. Plaintiff also worked at Kentucky Fried Chicken as a cashier for a period of approximately four months before she went to jail and at Dollar Store for a period of approximately two months after she was released from jail. R. 54-55. Immediately prior to the hearing, Plaintiff attempted to work in the childcare field, but she could not handle the job stress and could not be around other people due to her alleged disability. R. 42-43.

## 2. Vocational Expert Thomas Dunleavy's Testimony

The VE, Thomas Dunleavy, also testified before the ALJ. R. 54, 56-67. Dunleavy was familiar with the existing jobs in the Chicago Metropolitan area. R. 54. The ALJ asked Dunleavy a hypothetical question involving a 22 year old individual, with nine years of formal education and the same past relevant work as Plaintiff, who was "limited to a full range of work, except that there should be reduced interaction with others." R. 56. That job should "also be simple and repetitive and low in stress," meaning "there shouldn't be a lot of production pressure, and there shouldn't be a lot of over the shoulder supervision." R. 57. Dunleavy testified that there would be at least 15,000 manufacturing jobs, 15,000 inspector-packager jobs, and 8,000-9,000 housekeeping jobs[1] for the hypothetical individual. R. 58-59.

On cross-examination by Plaintiff's counsel, Dunleavy testified that an individual who would have to leave his or her station for two, ten-minute breaks per day would be unable to perform the manufacturing jobs. R. 61-62. An individual working in housekeeping jobs–either in commercial or residential properties–would be able to take two, unscheduled ten-minute breaks during the course of the workday as long as he or she could complete the assigned work. R. 62-63. An individual who was forced to miss one day of work per week, would be unable to find competitive employment; the maximum tolerable absences per year would range from 10 to 12 days per year. R. 65.

---

[1] Dunleavy based his estimation of the number of jobs available to the hypothetical individual on data from the *Dictionary of Occupational Titles.*

C.    **MEDICAL EVIDENCE.**

**1. Thomas Eagan - Social Worker**

On July 12, 2001, Thomas Eagan of Cornerstone Services, Inc., conducted a mental health assessment of Plaintiff. R. 458-64. Plaintiff exhibited a depressed mood and a blunted affect. R. 460. Eagan diagnosed Plaintiff with recurrent, major depressive disorder and panic disorder. R. 461. Eagan assessed Plaintiff's Global Assessment of Functioning ("GAF")[2] at 54, with a maximum GAF of 60 over the 12 months preceding the assessment. *Id.* Eagan noted that Plaintiff met serious impairment criteria for all areas of functioning, including, but not limited to: (1) social, occupational, or school functioning; (2) unemployment due to mental illness; (3) basic life and survival skills; and (4) a functional impairment that would continue without professional treatment. R. 463.

**2. Dr. Paul Killion - Psychiatrist**

On July 21, 2001, Dr. Paul Killion of Cornerstone Services, Inc., conducted a psychiatric evaluation of Plaintiff. R. 455-56. Dr. Killion noted that Plaintiff reported that she "gets 'all panicky'" and has a panic disorder. R. 455. She complained to Dr. Killion of "abrupt onset of anxiety, fearfulness that she [was] loosing (sic) her mind or having a heart attack … chest pain, shortness of breath, and paramecia." *Id.* These symptoms were

---

[2]The GAF is a numeric scale (ranging from 0 to 100) used by doctors and medical health professionals to measure the social, occupational and psychological functioning of adults. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. Text Revision 2000) (DSM-IV-TR). The Scale is presented and described in the DSM - IV - TR on page 32.

unprovoked and untriggered; Plaintiff could not "attribute them to any particular stress at [the] particular time." *Id.*

Dr. Killion diagnosed Plaintiff with panic disorder, indicating that she had suffered a high degree of stress over the previous year. R. 456. Dr. Killion assessed Plaintiff's GAF score at "between 50 and 60." *Id.*

### 3. Dr. Lakshmi Boddapati - Psychiatrist

On February 19, 2002, Plaintiff began treatment with Dr. Lakshmi Boddapati, a psychiatrist. R. 474. She complained of depression and panic attacks and reported difficulty sleeping and feeling stress at raising two children. *Id.* Dr. Boddapati diagnosed Plaintiff as having "major depression" and "panic disorder." R. 475. Dr. Boddapati assessed Plaintiff's GAF score at 50. *Id.* Plaintiff was prescribed medication and was to return in two months. Apparently, she never returned.

### 4. Dr. Ranganathan - Psychiatrist - Consultative Exam

On November 8, 2002, Dr. Ranganathan performed a psychiatric assessment of Plaintiff on behalf of the Illinois Bureau of Disability Determination Services. R. 482 - 83. Plaintiff reported that she had been diagnosed with bipolar affective disorder and was taking Lithium carbonate and Paxil. *Id.* Plaintiff also acknowledged problems with crack, cocaine, and marijuana for three and a half to four years before the examination, but stated to Dr. Ranganathan that she had been clean for six months and attending a drug program. *Id.* Dr. Ranganathan diagnosed Plaintiff with bipolar affective disorder and substance abuse. R. 483.

Plaintiff's GAF assessment was 45-50. *Id.*

### 5. Dr. Kirk Boyenga - Non-Examining Psychologist

On December 4, 2002, Dr. Kirk Boyenga, Ph.D., reviewed the Plaintiff's medical records and conducted an assessment of Plaintiff's residual functional capacity. R. 484-501. Dr. Boyenga did not examine Plaintiff nor speak with her. *Id.* Dr. Boyenga found that Plaintiff was moderately limited in: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to work in coordination with or proximity to others without being distracted; (5) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) the ability to interact appropriately with the general public; and (7) the ability to respond appropriately to changes in the work setting. R. 484-85. Dr. Boyenga concluded that Plaintiff was suffering from "an affective disorder and a substance addiction." R. 486. Dr. Boyenga concluded as follows:

> "She is mentally capable of performing simple tasks. Social skills are impaired, but allow settings with reduced interpersonal contact. Adaptation abilities are impaired. However, claimant can perform routine, repetitive tasks, as indicated by the ability to follow instructions and leave home alone."

*Id.*

### 6. Dr. Guschwein - Treating Psychiatrist

In 2003, Plaintiff sought treatment for depression and she reported suffering from anxiety and chest pains since being released from jail in 2001. R. 508. On April 22, 2003, Dr. Guschwein, of the Will County Health Department, performed a psychiatric evaluation. R. 508-09. Plaintiff told Dr. Guschwein that her condition began in 1994 or 1995 when she was hospitalized for a suicide attempt. According to Plaintiff, previous doctors had prescribed Paxil, Prozac, and Lithium, all of which had been ineffective. She also reported being raped twice in the previous year by the same man. *Id.*

Dr. Guschwein described Plaintiff's appearance and attitude as depressed and distracted. R. 509. Her mood was depressed and her attention and concentration were impaired. *Id.* Dr. Guschwein identified Plaintiff as a "mild" suicide risk. *Id.* He diagnosed her condition as major, recurrent depression and panic disorder and pointed to severe physical abuse and rape in the years leading up to the evaluation. *Id.* Dr. Guschwein assessed Plaintiff's GAF at 30. *Id.* A GAF of 30 means that Plaintiff's "behavior is considered influenced by delusions or hallucinations or serious impairment in communications or judgment or inability to function in all areas." DSM IV-TR at 34. Dr. Guschwein prescribed Zoloft and Lorazepam and continued to treat Plaintiff monthly. R. 506-07, 530. Dr. Guschwein adjusted her medications, but she continued to have problems with her nerves. R. 506.

**D.     THE ALJ'S DECISION – MAY 25, 2004**.

The ALJ found Plaintiff was not disabled as defined in the Social Security Act. R. 11-21. The ALJ found Plaintiff had the residual functional capacity to perform "no more than simple, repetitive tasks in a low stress environment with no significant interaction with others." R. 20. The ALJ concluded that Plaintiff "could be expected to make a vocational adjustment to work that exists in significant numbers in the regional economy." *Id.* Therefore Plaintiff was not disabled. *Id.*

The ALJ assessed Plaintiff's application under the five-step analysis described, *infra*, in Part II B. First, the ALJ determined that Plaintiff did not engage in any substantial gainful activity since the onset of her alleged disability. *Id.* Second, he found that Plaintiff's affective disorder and anxiety were "severe" impairments as defined in the regulations. *Id.* (citing 20 C.F.R. §§ 404.1520, 416.920 (2005)). At step three, the ALJ found that those impairments did not meet or medically equal one of the listed impairments in the regulations. R. 20. Fourth, he found that Plaintiff was unable to perform any of her past relevant work. *Id.* Finally, the ALJ found that there were a significant number of jobs in the region that she could perform.[3] *Id.* As a result, the ALJ determined that Plaintiff was not disabled and not eligible for SSI or DIB. R. 20-21.

---

[3]Specifically, the ALJ found that there were 15,000 jobs as an assembler, 15,000 jobs as a packager, and 8,000 jobs as a housekeeper in the Chicago metropolitan area, which Plaintiff could perform. *Id.*

## II. LEGAL STANDARDS

### A.    STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g); judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether substantial evidence in the record supports the findings. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Smith v. Apfel*, 231, F.3d 433, 439 (7th Cir. 2000) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted)). A "mere scintilla of proof will not suffice to uphold the SSA's findings." *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). When there is substantial evidence in the record to support the ALJ's decision, the findings must "build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). If the ALJ's decision lacks evidentiary support for its conclusions or fails to adequately discuss the issues presented, it cannot stand. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); however, it "cannot substitute [its] own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Diaz*, 55 F.3d

305-06. Thus, the issue before this Court is not whether or not Plaintiff is disabled, but whether the ALJ's findings were supported by substantial evidence and built a logical bridge between that evidence and the result. *Id.* at 306; *Sarchet*, 78 F.3d at 307. The Court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    DISABILITY STANDARD**

Disability insurance benefits are available to applicants who can establish disability under the terms of Title II of the Social Security Act ("Title II"). *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). Supplemental Security Income available to "disabled indigent persons" under Title XVI of the Social Security Act ("Title XVI"). *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Under the Title II definition of "disability" and the Title XVI definition of "disabled," an individual is disabled if that person has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(B) (2000). The statute further clarifies that an individual is under a disability if that person in unable to do his or her previous work and cannot partake in any gainful employment in the national economy given his or her age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds that the claimant is

not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Ismahel v. Barnhart,* 212 F. Supp 2d 865, 872 (N.D. Ill. 2002).

### III. DISCUSSION

Plaintiff raises four issues for review: (A) whether the ALJ failed to include all of the limitations identified by Dr. Boyenga and failed to analyze the testimony of the vocational expert in light of those limitations; (B) whether the ALJ failed to consider the extent to which mental health professionals–particularly the current treating physician Dr. Guschwein–described Plaintiff's limitations; (C) whether the ALJ failed to accurately assess the credibility of Plaintiff's testimony regarding the impact of her impairments; and (D) whether the ALJ adequately articulated the grounds for his decision. The Court treats each of these arguments in turn.

### A. THE ALJ FAILED TO CONSIDER CERTAIN FUNCTIONAL LIMITATIONS.

The ALJ found that Plaintiff had certain functional limitations, which largely tracked the limitations identified by the reviewing psychologist, Dr. Boyenga. R. 17-18, 484-501. Plaintiff contends that the ALJ failed to consider Dr. Boyenga's conclusions that she was moderately limited in her ability to complete a normal workday or workweek without

interruption from symptoms of her alleged disability and that Plaintiff was moderately limited in her ability to maintain concentration for extended periods. The Commissioner responds that Dr. Boyenga set forth these conclusions in Section I of his functional limitation assessment, that Section I of the assessment is merely a worksheet for preparing the ultimate conclusions in Section III of the assessment, and that the ALJ properly formulated the hypothetical to the VE based on the conclusions Dr. Boyenga set forth in Section III.

While Section I of the RFC assessment is designated for the examiner's summary conclusions (with the ultimate conclusions regarding the claimant's RFC appearing in Section III of the document), the findings in Section I are "derived from the evidence in the file." R. 484. Thus, Dr. Boyenga found some evidence in the record that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions caused by her alleged disability and in her ability to maintain attention and concentration for extended periods.

The ALJ found that "the claimant [had] the following residual functional capacity: she is able to perform no more than simple, repetitive tasks in a low stress environment with no significant interaction with others." R. 20. This RFC determination seems to include Plaintiff's limitation in her ability to maintain attention and concentration for extended periods of time, but it does not include Plaintiff's limitation in her ability to complete a normal workday and workweek without interruptions caused by symptoms of her alleged disability. By failing to include this limitation, the ALJ failed to consider all of the available

evidence in determining Plaintiff's RFC.

"The hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994). In framing the hypothetical question to the VE, the ALJ asked about the possibility that the hypothetical individual might require two unscheduled, ten-minute breaks during the course of the workday. R. 61-62. The VE responded this factor would likely preclude the hypothetical individual from working in the manufacturing jobs, but the hypothetical individual would be able to work in the housekeeping jobs. R. 62-63.

On cross-examination, the VE was asked whether a hypothetical individual who suffers from depression and needed to miss work once a week would be able to sustain employment in the housekeeping jobs. R. 65-66. The VE responded that the hypothetical employee could potentially have difficulty sustaining employment in the housekeeping sector due to numerous absences, particularly during the probationary period at the beginning of the employment. R. 66. Therefore, the failure to include this limitation in the RFC should have been explained by the ALJ in light of Dr. Boyenga's findings and Dr. Guscwhein's assessment of Plaintiff's GAF at 30.

## B. THE ALJ FAILED TO PROPERLY CONSIDER EVIDENCE PRESENTED BY PLAINTIFF'S TREATING PHYSICIAN.

In determining a claimant's RFC, the ALJ generally should give more weight to the opinions of the claimant's treating physician. 20 C.F.R. § 404.1527(d)(2) (2005); *see also*

*Clifford*, 227 F.3d at 870 (7th Cir. 2000) ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances"). Here, the ALJ gave little regard to the diagnosis of Plaintiff's most recent treating physician, Dr. Guschwein, whose mental health evaluation of Plaintiff potentially provided evidence of more severe limitations resulting from her disability than the report of Dr. Boyenga, who never examined Plaintiff.

Tellingly, the ALJ summarized the findings of Plaintiff's consultations with Drs. Killion, Boddapati, and Ranganathan, but provided only cursory mention of her examinations by Dr. Guschwein, which occurred in closest proximity to the hearing. The ALJ indicated that "[t]he claimant was also treated at the Will County Health Department Mental Health Division between April 8, 2003 and September 16, 2003" and that "[d]uring this time she was prescribed medication for anxiety and depression." R. 17. The ALJ makes no mention of Dr. Guschwein's diagnosis of Plaintiff's condition as major recurrent depression and panic disorder, nor of the fact that Plaintiff's GAF score was 30, which can mean an "inability to function in all areas." DSM-IV-TR at 32-34.

Moreover, the ALJ did not articulate a reason why Dr. Guschwein's diagnosis was not mentioned in the findings and presumably given less weight than the diagnoses of Plaintiff's prior treating physicians and the SSA's consulting psychologist, Dr. Boyenga. The ALJ explained that Dr. Boyenga's opinion "deserve[d] some weight" along with the opinions of the treating physicians, but gave no basis for his decision to give greater weight to Dr.

Boyenga's opinion vis-à-vis Dr. Guschwein's diagnosis in reaching his decision regarding Plaintiff's functional capacity.

The question of whether Plaintiff's putative disability would render her incapable to complete the workday without repeated interruptions or to regularly attend work without a significant number of absences is a critical factor in determining whether she is disabled. Dr. Guschwein's evaluation of Plaintiff's mental state, at a time closer to the hearing than any of the other diagnoses, bears directly on that question. The ALJ's failure to clearly articulate his reasons for the relative emphasis he gave to Dr. Boyenga's testimony over that of Dr. Guschwein is grounds for remand.

## C. THE ALJ FAILED TO ACCURATELY ASSESS THE CREDIBILITY OF PLAINTIFF'S TESTIMONY AND FAILED TO ARTICULATE SUFFICIENT GROUNDS FOR THE REJECTION OF HER TESTIMONY.

The ALJ's determination of the claimant's credibility is entitled to substantial deference. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The ALJ is able to observe the live testimony of the claimant, and a "reviewing court lacks such direct access to the witness[]." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). However, the ALJ must articulate a clear basis for his findings regarding the claimant's credibility. *Shramek*, 226 F.3d at 811. Put another way, "[w]here … 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result,' [the court] cannot uphold the ALJ's determination." *Id.* "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must

be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

The ALJ's conclusory statements regarding Plaintiff's credibility are contradicted by the evidence in the record. The ALJ discounted Plaintiff's statements about the severity of the limitations caused by her disability, finding that "her allegations [were] not fully credible." R. 17. To support this conclusion, the ALJ points to the facts that "[t]he record reveals relatively infrequent trips to the doctor for the allegedly disabling symptoms," and that plaintiff "was discharged from treatment from Cornerstone Services because she did not keep her appointments" and "failed to attend … two appointments" with Dr. Boddapati which led to her discharge from Dr. Boddapati's care. *Id.* The ALJ does not, however, articulate any basis for the conclusion that Plaintiff's missed appointments with Cornerstone and Dr. Boddapati undermined the veracity of her assertions regarding her disability.[4] Nor are plaintiff's monthly visits to Dr. Guschwein discussed in the credibility section. In short, the ALJ failed to build the required logical bridge between the evidence and his conclusion.

Indeed, the evidence in the record actually bolsters Plaintiff's credibility. Plaintiff's testimony at the hearing–particularly regarding the extent and impact of her alleged disability–was consistent with the information she provided to a number of medical health

---

[4]The ALJ also fails to address the issue that Plaintiff's missed appointments may, in fact, be proof of the severity of her limitations. The fact that Plaintiff was unable to attend follow-up appointments for treatments may be proof that her disability severely limits her ability to leave her home. The ALJ's findings are silent on this point.

professionals, including Dr. Killion, Dr. Boddapati, Dr. Ranganathan, and Dr. Guschwein.

Over a period of nearly three years, she described the onset of debilitating panic attacks,

which impaired her ability to work and function in society. Having discounted Plaintiff's

credibility, the ALJ ignored Plaintiff's testimony that as often as three out of every four times

she attempted to walk to the store, she would have to return home after the onset of a panic

attack. R. 34-35. Thus, the matter should be remanded back to the ALJ in order to more fully

assess Plaintiff's credibility in light of the objective medical evidence.

## D.     THE ALJ FAILED TO ADEQUATELY ARTICULATE THE GROUNDS FOR HIS DECISION.

The ALJ has a duty to develop a complete record. *Sheck v. Barnhart*, 357 F.3d 697,

702 (7th Cir. 2004); *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993) ("With the

informality, which simplifies administration of the [disability] program and makes it more

accessible to the public, comes a duty for the presiding officer to develop a complete

record."); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) ("A well-settled

proposition regarding social security disability hearings is that '[i]t is a basic obligation of

the ALJ to develop a full and fair record.'" (internal citations omitted)). Moreover, the ALJ's

determination of the claimant's RFC must include all of the claimant's impairments

supported by the evidence in the record. 20 C.F.R. § 404.1545(a)(3) (2005); *see also Dixon*

*v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("in assessing the claimant's RFC, the

ALJ must consider both the medical and nonmedical evidence in the record").

Here, the ALJ's decision failed to build the necessary logical bridge between the

evidence in the record and his conclusions regarding Plaintiff's disability. First, the ALJ

failed to include all of the limitations identified by Dr. Boyenga in determining Plaintiff's

residual functional capacity and failed to include certain key limitations in the hypothetical

question posed to the VE. In Section I of his report, Dr. Boyenga found that Plaintiff was

limited in her ability to complete a normal workday and workweek without interruptions

from psychologically based symptoms. R. 484-85. Such a limitation would have a substantial

impact on Plaintiff's ability to secure gainful employment. The ALJ, however, did not

articulate why this limitation was excluded from the ultimate conclusion regarding Plaintiff's

residual functional capacity, nor why this limitation was not included in the hypothetical

question posed to the VE.

Second, the ALJ failed to explain the exclusion of Plaintiff's treating psychiatrist, Dr.

Guschwein's, diagnosis of the severity of Plaintiff's impairments. Dr. Guschwein determined

Plaintiff's GAF score to be 30, R. 509, which indicates that her "behavior is considered

influenced by delusions or hallucinations or serious impairment in communications or

judgment or inability to function in all areas." DSM IV-TR at 34. In addition, Dr. Guschwein

diagnosed Plaintiff with major recurrent depression and panic disorder. R. 509. Dr.

Guschwein's diagnosis, particularly the low GAF score, bears directly on the question of

Plaintiff's ability to find and sustain gainful employment.[5] The failure to discuss all of the

---

[5]The ALJ also made no attempt to contact Dr. Guschwein to inquire further into the specifics of his diagnosis or the status of Plaintiff's ongoing treatment. *See* 20 C.F.R. § 404.1512(e)(1) (2005) (ALJ may contact treating physician to obtain more information regarding claimant's disability).

relevant evidence which bears on the determination of the claimant's residual functional capacity constitutes reversible error requiring a remand to the ALJ to consider all of the relevant evidence. *Clifford*, 227 F.3d at 871.

## IV. CONCLUSION

The ALJ failed to consider functional limitations identified by Dr. Boyenga in assessing Plaintiff's residual functional capacity. The ALJ failed to consider the opinion of Plaintiff's most recent treating physician and failed to articulate grounds for the decision to not rely upon that evidence. The ALJ also failed to accurately assess Plaintiff's credibility and failed to adequately articulate grounds for his decision. Therefore, for the reasons set forth in this opinion, **Plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and the matter is remanded to the ALJ for further consideration.**

**SO ORDERED THIS 3rd DAY OF MARCH, 2006.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

M. Jacqueline Walther
KIELIAN AND WALTHER
33 West Jackson Blvd.
Suite 201
Chicago, IL 60604

Counsel for Plaintiff

Carole J. Kohn
SOCIAL SECURITY
ADMINISTRATION
Office of the Regional Chief Counsel
200 West Adams
30th Floor
Chicago, IL 60606

Counsel for Defendant